For the reasons stated by W. M. Stevenson, Esq., special referee herein, concurred in by his Honor, Judge Bowman, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

Judgment affirmed.

## 9170

### BORDER STATE LUMBER CO. v. EDWARDS *ET AL.*

#### (88 S. E. 537.)

FRAUDULENT CONVEYANCES. EQUITY. SUBROGATION. CORPORATIONS. AGENCY. EVIDENCE.

1. FRAUDULENT CONVEYANCES—SUBROGATION.—The right to subrogation is equitable, and will not be accorded to one participating in the fraudulent schemes of a debtor to place his property beyond the reach of creditors.

1a. FRAUD—BURDEN OF PROOF.—Where plaintiff is the instrument by which fraud was perpetrated, the burden of guiltlessness of fraud rests upon him.

2. CORPORATIONS—AGENCY—EVIDENCE.—Where a corporation entrusts the management of its affairs to its president and treasurer, their acts done, and knowledge acquired, in transacting such business are imputable to it, and may be shown in evidence against it.

3. WITNESSES—EVIDENCE.—After cross-examination of a witness offered to establish the *bona fides* of an alleged fraudulent transaction, the Court may, in its discretion, admit in evidence contradictory statements and conduct by him.

3a. FRAUD—EVIDENCE.—Where fraud is charged, the inquiry assumes a wide range, and the rules of evidence are not so strictly enforced as in other cases.

4. FRAUDULENT CONVEYANCES.—A finding that plaintiff corporation took over certain property from its president, in order to assist him in fraudulently removing it beyond the reach of creditors, affirmed.

5. FRAUDULENT CONVEYANCES—EQUITY.—Where a corporation took an assignment of property from its president in order to aid him in fraudulently removing same beyond the reach of creditors, the Court of equity will not aid it to enforce its demands growing out of such transactions against such creditors.

6. SUBROGATION — ACTION — EVIDENCE. — Evidence that plaintiff was involved in fraud *held* to bar its claim of subrogation.

Before RICE, J., Greenville, Fall term, 1913.    Affirmed.

Action by Border State Lumber Company, a South Carolina corporation, against H. A. Edwards, W. J. Thackston, H. J. Haynsworth, J. Perry Poole, as sheriff of Greenville county, and City National Bank of Greenville, a South Carolina corporation.  The facts are stated in the Circuit decree, as follows:

The above stated cause came on for hearing before me at the Fall, 1913, term of the Court of Common Pleas for said county upon testimony taken by the master.

The issues present a contest between the plaintiff and the defendants, Edwards, Thackston and Haynsworth, over the sum of six thousand forty-six and 88-100 ($6,046.88) dollars, and two hundred (200) shares of stock.  The said moneys being now on deposit to the credit of said H. J. Haynsworth and B. F. Martin, Esq., in the savings department of the said bank, as trustee, and the said stock being now in the hands of said bank as trustee.  This arrangement was entered into by the attorneys of the contestants, with the understanding that both the money and the stocks were to abide the result of this suit.

The defendants, Edwards, Thackston and Haynsworth, claim the right to subject the said money and stocks to the payment, so far as they will go, of a judgment obtained by them against one R. E. Johnston.  The said money and stock were attached by said defendants as the property of said Johnston, in the hands of the defendant bank by Sheriff Poole, of Greenville county, on November 18, 1908, in an action by said defendants against the said Johnston, which later resulted in the aforesaid judgment, amounting to $100,000.  The stock above referred to consists of one hundred and fifty shares of the Saluda River Lumber Company, a South Carolina corporation, and fifty (50) shares of the capital stock of the Border State Lumber Company, the plaintiff herein.

The moneys above referred to are a part of the proceeds of a note for $13,412.42, dated March 25, 1906, executed

by the plaintiff to the said R. E. Johnston, and by him pledged, along with the said shares of stock, to the City National Bank of Greenville, S. C., defendant above named, for a loan, which at first amounted to $12,000, but later was reduced to $8,621.08, evidenced by a note of said Johnston to said bank, and secured by the same collateral. The last mentioned note was dated January 2, 1908, and when it matured was not paid, and after numerous efforts to collect, the said bank, on February 1, 1912, brought suit on the said collateral note of Border State Lumber Company, which suit resulted in a judgment for $18,511.97, which, after some delay, was paid by said Border State Lumber Company, and at the time of payment amounted to some $19,000. Out of the proceeds of said judgment $13,004.52 was applied in satisfaction of the sum due on the note last given to City National Bank of Greenville, as above stated, and the difference between the amount of the judgment paid by Border State Lumber Company, and the amount used in settlement of the said note of R. E. Johnston to City National Bank of Greenville, is the sum first hereinabove mentioned over which this litigation is pending.

As above stated, the judgment of said City National Bank on the said note of Border State Lumber Company was not taken until the early part of the year 1912, but prior to that time events were transpiring that held the said sum of money and the said stocks in the hands of said City National Bank, without any action on its part, as will be presently shown.

On October 5, and November 18, 1907, one Bowen caused attachments to be levied on the aforesaid collateral securities in the hands of the said bank, in two suits aggregating $17,700, and upon which judgments were later obtained for the sum total of $2,565. The attachment of Edwards, Thackston and Haynsworth, hereinabove mentioned, followed on November 18, 1908, their suit resulting in the judgment for $100,000 above mentioned.

The plaintiff contends that, having settled with Johnston in full for their said note by the issuance to him of capital stock of the company, while the said note was hypothecated, and having paid off the judgment recovered against it on said note, it is entitled to the proceeds thereof over and above the amount due the pledgees, and is also entitled to be subrogated to the rights of the pledgee in the other collateral, the 200 shares of stock.

The defendants, Edwards, Thackston and Haynsworth, answer, denying that the said note for $13,412.43 has ever been settled for as between Border State Lumber Company and R. E. Johnston, and allege that the release of the said note to plaintiff set up in the said complaint, the conveyance of real estate by said Johnston to plaintiff, and the issue of stock to said Johnston by the plaintiff in settlement of said note were all done in pursuance of a scheme of collusion and fraud, originated by said Johnston, and participated in by plaintiff, to put the property of said Johnston beyond the reach of his creditors.

The defendants have not satisfied me that the conveyance by said Johnston of his real estate to Border State Lumber Company, and the issuance by it of stock in payment of said lands and the said note, were pretensive transactions. But the evidence abundantly shows, and I so find, as a matter of fact, that when said transactions had been completed, there remained in this State, and so far as the evidence shows, in no other State, any property of the said Johnston, except that now involved in this litigation, upon which execution could be levied to satisfy the said judgment of Edwards, Thackston and Haynsworth. The testimony of Mr. Haynsworth establishes that the three defendants just named, by acquiring the Bowen judgments, had succeeded in wringing out of same about one per cent. of the judgment recovered by them against the said Johnston, and this is all that they have succeeded in securing in settlement of said judgment.

From the evidence before me, the said Johnston appears to have exhibited great energy and business ability, and shortly before the said Edwards, Thackston and Haynsworth judgment was obtained against him owned large holdings of timber lands in this State. However, when the said attachment of Edwards, Thackston and Haynsworth was levied, followed by the judgment above referred to, these large holdings in lands seemed to have melted away, and been transformed into more portable goods, to wit, stocks of the said Border State Lumber Company.

However charitably we may view the transactions between the said Johnston and the plaintiff, as detailed in the complaint herein, it cannot be denied by any one conversant with the facts, that such transactions have enabled the said Johnston up to this time, to defeat the said defendants in the collection of their said judgment against him, with the comparatively insignificant exception above noted. And the evidence further discloses the fact that Johnston is now insolvent.

No one in his right mind will deny, I apprehend, that if the said Border State Lumber Company owed Johnston, that it had as much right to settle such indebtedness by the issuance of stock to him, as to pay him in money. But if such transaction was part and parcel of another, fraudulent in its nature and participated in by both parties, then such payment loses its *bona fide* character, and becomes tainted with fraud.

Still, whatever the consequences may be to Edwards, Thackston and Haynsworth, if the aforesaid transactions between Johnston and the plaintiff, set out in the complaint, were free from the stain of fraud and with the stamp of good faith upon them, the said defendants must needs pocket their losses, whether they be content therewith or not.

No human being can look into the heart and mind of another and discover what of good or evil may be there. Neither do the words of men always disclose the promptings

of the inner self.  Common experience has taught us that the surest index to the intents, motives and purposes of men are their acts fairly and impartially judged, in the light of their surrounding circumstances.  No act is to be construed as evidencing an evil intent if it may be fairly construed otherwise.

The defendants, Edwards, Thackston and Haynsworth, charge the plaintiff and the said Johnston with collusion in the fraudulent purpose and intent of Johnston to defeat and defraud them of collecting their just claims against the said Johnston.

To better enable us, then, to judge of the intents and purposes of the said Johnston towards his said creditors as evidenced by his acts in the transaction now before us, we will consider his situation and the circumstances which surrounded him just prior to, at the time of, and some time before the Edwards, Thackston and Haynsworth judgment was obtained against him.

From its organization, somewhere about 1904, until 1912, when he disappears into the shades of obscurity, so far as the evidence discloses, Johnston was the president, central figure and moving spirit of the Border State Lumber Company, the plaintiff herein.  He appears to have been a restless, active and energetic trader, speculator and promoter, with large business capacities.  The said company of which he was the head, is a South Carolina corporation with nominal headquarters at Williamsport, Pa.  During the administration of the affairs of said company by Johnston, H. T. Kraemer was a director, and secretary and treasurer thereof, and he and Johnston had offices in Greenville, S. C., occupied by them jointly, and offices also at Washington, D. C. The evidence shows, that these two men, the one, the secretary and treasurer, and the other the president of said company, during their administration of the affairs of the said company, became very close and intimate business associates,

and together directed, and virtually controlled the affairs of said company, Johnston being the dominating member, and no meeting of the board of directors of said company was held from 1904, up to 1911.

In addition to his business in connection with the affairs of the said Border State Lumber Company, Johnston was a large dealer on his own account in timber lands, and in the course of such dealings became indebted to the said Edwards, Thackston and Haynsworth in a large amount which ultimately resulted in the judgment already adverted to. Just when the latter claim accrued does not clearly appear as I have not the judgment roll in the case of the said parties against Johnston in the case in which the aforesaid judgment was obtained, but from the testimony of Mr. Haynsworth, and by reference of counsel to said record, I infer that it must have been several years prior to 1907; and for some time prior to the last mentioned date, Edwards, Thackston and Haynsworth had been insistent in their demands for the payment of the said sum due them by Johnston. In the meantime the Bowen claims, aggregating $17,700, had arisen, and when the fall of 1907 arrived Johnston found himself confronted by money demands amounting in the aggregate to $117,700, with the claimants clamoring for their money. These were no fanciful claims, either, as events subsequently showed, and Johnston well knew.

In the summer just preceding the said fall of 1907, Johnston suddenly left Greenville, and so far as the evidence shows, never returned. Thereafter, one event hastened upon the heels of another as the evidence discloses.

Said events, stated in their chronological order, being as follows: October 5, and November 18, 1907, attachment in the Bowen suit of all the real estate of Johnston in Greenville county, and also the securities hereinabove mentioned in the hands of the City National Bank of Greenville.

October 1, 1907, deed from Johnston to Arnold, 1,204 acres of land in Greenville county, consideration expressed, $6,400.

December 15, 1907, unilateral paper executed by Johnston purporting to release Border State Lumber Company from its said $13,412.42 note with no consideration for said release expressed.

January 1, 1908, the five (5) directors of the Border State Company sign individually, but professing to act for said company, a paper reciting the fact of the indebtedness of the company to Johnston, evidenced by its said note for $14,000, and that the company was desirous of acquiring timber lands of Johnston adjoining the lands of said company, and authorizing the president and treasurer to issue to said Johnston four hundred and ten shares of the stock of the company in settlement of said note, and in payment of the purchase price of 3,800 acres of timber lands from said Johnston, and that Johnston had agreed to accept said stock in payment of said note and lands, promising at the next meeting of directors to ratify their said action. In the winter of 1907, just what time does not appear, but after the Bowen attachments, one H. A. Arnold, an employee of Johnston, appears at the office of Mr. Haynsworth, in Greenville, stating that he had been sent to this State by Johnston to look over his timber holdings, and that Johnston desired Mr. Haynsworth to draw deeds conveying all of his timber lands to Border State Lumber Company, Haynsworth refusing to draw the deeds when he learns from Arnold that there had been no sale, but that Johnston desired to have the matter fixed that way.

February 7, 1908, for the express consideration of $3,314, Johnston executes to Border State Lumber Company warranty deed purporting to convey 1,657 acres of timber lands in Greenville county.

March 10, 1908, for the expressed consideration of $1 and other valuable considerations, H. A. Arnold executes a

quitclaim deed to said 1,204 acres of land in Greenville county. This same tract having been conveyed to Arnold by Johnston on October 1, 1907, without the knowledge or consent of Arnold, as the latter's evidence discloses, and the deed of conveyance being as memoranda, page 7, hereinabove referred to.

March 17, 1908, the stock certificate book shows 426 shares of stock issued to Johnston, and 84 to Arnold. The said book shows also that on same date 100 of the 426 shares issued to Johnston were assigned by him in blank and pasted back on the stubs of said certificates in said book. That the shares issued by said company to Arnold were all transferred by Johnston to him.

November 18, 1908, attachment of Edwards, Thackston and Haynsworth in the suit which resulted in the $100,000 judgment hereinabove mentioned.

In connection with the above recital, and as shedding some light upon the motives and purposes of Johnston in the above transactions, let us examine the status of the property to be acquired by the said company on January 1, 1908, which is the date of the paper claimed to contain the terms of the agreement between Johnston and the company.

Note at that time tied up for a year..............$14,000
    Attached for $17,700.
1,657 acres of land, at $2 per acre...............  3,314
    Also attached in above suit.
1,204 acres of land, at $7 per acre...............  8,428
    Also attached.

                                              $25,742

    Claims against above property at that time were:
Above attachment ..........................$17,700
Note Johnston to City Nat'l Bank of Greenville....  8,621

                                              $26,321

And on March 17, 1908, when Johnston issued to himself stock of the company signed by himself as president and H. T. Kraemer, as treasurer, the same conditions existed. The said stock so issued, if we give him credit for the 100 shares pasted back in the stock book and assigned in blank, amounted to $31,000. That is to say, $31,000 of stock, worth, according to the undisputed evidence, 100 cents on the dollar, which Johnston was receiving, and for which he was turning over to the said company $25,742 worth of property encumbered with claims amounting to $26,321.

Bearing in mind the fact, as shown by the evidence, that no effort has been made by him towards payment of any part of his obligations to Edwards, Thackston and Haynsworth, and that only about 1 per cent. of said indebtedness has been paid by the application thereto of the small sum wrung out of the property of the said Johnston by means of the Bowen judgments; and bearing in mind, also, the fact that he has not appeared to make any explanations of the above transactions, although charged with fraud in both their inception and execution, and that his silence remains unexplained; and further bearing in mind the fact as already stated, that such transactions have placed his property in the State, with the exception of that now in dispute, beyond the reach of his creditors, it appears to me that the bare recital of the facts above shown are sufficient to establish beyond a reasonable doubt the *mala fides* of the said Johnston and his purpose and intent to defraud his South Carolina creditors, and I so find, as matter of fact.

Another circumstance worthy of note in connection with the above, is that the stock certificate book above referred to, shows that the certificates of stock covering 410 shares, signed by Johnston, as president, and Kreamer, as treasurer, begin with No. 36 and end with No. 48, inclusive, the handwriting in the body of the certificates being the same as the signature of the president, and at the top of the stub of No. 36, appears the memo. "14000, 27000 for 3,861 acres of

land." When we remember the terms of the paper of January 1, 1908, signed by the five directors, in which Johnston was to convey 3,800 acres of land to the company, and we note that the certificates of stock immediately follow in regular succession the above memo., it is only reasonable to infer that such memo. was made by Johnston, and that said shares of stock were issued in payment of 3,861 acres of land, while the evidence shows that only 2,861 acres were actually conveyed. Why he should represent to the said directors that he owned 3,800 acres of land and agree to convey the same to the company, when in fact, he had only 2,800 acres, stands unexplained. Also, whether Kraemer discovered the shortage in acreage and refused to deliver the stock until the error was corrected, or whether Johnston was mistaken in his land holdings and himself corrected the error upon discovery thereof, also remains a mystery, as Kraemer was dead before the commencement of this action, and Johnston is silent on the subject. The discrepancy of 1,000 acres worth $7,000 is certainly a glaring one, even for a large operator.

Counsel for plaintiff contend that Johnston had other lands than those in this State, and that such difference in acreage may have been in another State. If so, there is no evidence of that, and the paper of January 1, 1908, recited that the lands which the company desired to purchase, and which Johnston had agreed to convey, *adjoined* those of the company. As the lands of the latter were in this State, we can only infer that the lands to be conveyed by Johnston were also situated in this State.

Up to this time we have considered only the conduct of Johnston in the transaction above referred to, and however reprehensible such conduct may have been towards his said creditors, nevertheless if the plaintiff is in nowise culpable, and has been guilty of no breach of duty in the premises, then it comes into this Court with clean hands and can demand of it the relief to which it may be entitled in the matters under consideration. It alleges that it is entitled

to the sum of money in dispute and should be subrogated to the rights of said bank in the securities hereinabove referred to.

Chan. Johnston, in *Gadsden, admr.,* v. *Brown & Wellman,* 17 S. C. Eq. (Speer's Eq.) 37, says, that "subrogation is a pure, unmixed equity, having its foundation in the principles of the natural justice," and that in its application "it had been directed exclusively to the relief of those who were already bound, who could not but choose to abide the penalty." Having determined that the intent and purpose of Johnston in the transactions hereinabove set out was to defraud his creditors, and having shown that the results of said transactions was to place the whole, or nearly so, of his said property beyond the reach of his creditors, except the property involved in this suit, and, it appearing beyond peradventure, that the plaintiff was intimately associated and connected with said transactions, being, in fact, the instrument by means of which the said Johnston was enabled to perpetrate the said fraud upon his said creditors, the burden of proof now rests upon the plaintiff to establish by the greater weight of the evidence that it is guiltless of any part or parcel in the fraudulent purpose of Johnston.

We will then next consider the relation of the plaintiff towards the said transactions of Johnston.

The defendants contend very strenuously that the plaintiff has failed to prove the agreement set out in paragraph 7 of the complaint, and up to this point in the discussion, I have refrained from passing judgment on the question, but I will say now, that I cannot agree with this view. If the plaintiff relied alone upon the paper dated December 15, 1907, then the position of the defendants would be tenable, because the said transaction was *ex parte,* was for no consideration, so far as the evidence shows, is not under seal, and I am satisfied that Johnston and Kraemer were the only directors of the said company who had ever seen it when the paper of January 1, 1908, was signed by the directors.

Nevertheless, the allegations of said complaint are "on or about" the said date, and the terms of the agreement as alleged more nearly correspond with the terms of said paper dated January 1, 1908, signed by the five (5) directors. But, even conceding that the above be true, the said defendants contend that there was no corporate action upon said matters evidenced by said paper, and that the parties signing said instrument did not sign as directors, but as individuals and at different times, and while at different places. The facts thus stated are established by the evidence, but said parties did not profess to act for themselves but for the company, and the latter, not the individuals, were to be benefited by the transaction, and, as between Johnston and the company, I think there is evidence to sustain such an agreement as could have been enforced in a Court of equity.

The plaintiff vigorously contends that it is not bound by the acts and doings of its treasurer, H. T. Kraemer, who, together with the said Johnston, was in active control and management of the affairs of the company, as we have heretofore held, and his knowledge is not imputable to the company. There is no force in such contention. As we have already seen, Johnston and Kraemer, so far as the "business end" of the proposition was concerned, were the "company," and it will now be heard when it comes into this Court to deny responsibility for the actings and doings of its said officers chosen by it to administer its affairs.

What relation, then, did Kraemer sustain toward the conduct of Johnston in the transactions placing his property out of the reach of his creditors? As we have already held, they were very intimately associated in business during the period covered by all the said transactions. The paper dated December 15, 1907, was found after Kraemer's death among the papers of the said company in his possession. Mr. Haynsworth testifies that Kraemer was present when Johnston, in 1906, offered to put up as collateral for a loan to be

secured from the said City National Bank of Greenville, for him by Mr. Haynsworth, the note for $13,412.42 and the stocks hereinbefore mentioned.

He further testifies that in January or February of 1908, Kraemer was in Greenville and inquired of Mr. Haynsworth as to whether or not Johnston had ever settled the debt due by him to Edwards, Thackston and Haynsworth, and was then informed by Mr. Haynsworth that he had not, and seemed determined not to do so.    At the same time Kraemer was informed by Mr. Haynsworth of the Bowen attachments, of the intention of the bank to force the Border State Lumber Co. to pay its said collateral note, and conversations on the same subject took place between the same parties, and to practically the same purport and effect, in 1909, and February, 1910, and in not one of said conversations did the said Kraemer ever hint or intimate that the note of plaintiff under consideration had been paid.    Indeed, Mr. Haynsworth testifies that he knew absolutely nothing of such claim until May, 1910, when Kraemer stated to him that Johnston would have to look after it—that he regarded the company as protected, no matter how the suit went, and even then did not state what arrangements had been made by Johnston with the company.

Mr. Haynsworth also testifies that in the conversation between himself and Kraemer in the early part of February, 1908, they discussed the fact that all the property Johnston had in this State had then been disposed of except his stock in the said company and some two or three thousand acres of timber lands.

Haynsworth testifies also that Kraemer knew practically all of Johnston's private business, and acted in a large measure as his secretary.

The plaintiff objected to a great deal of Mr. Haynsworth's testimony as to his conversation with Kraemer, and also his conversations with Arnold, but where fraud is charged, the

inquiry assumes a wide range and the rules of evidence are not so strictly enforced as in other cases.

Then, Arnold testified that he was often employed by Johnston to look after his timber lands. That Kraemer then knew of Johnston's financial condition at the time the agreement of January 1, 1908, was entered into by the said directors and Johnston, and at the time of the issuance of the stock of the said Border State Lumber Company in pursuance of said agreement, and further that when said conveyance had been made and the said stock issued, that all of said Johnston's property except that in pledge to City National Bank of Greenville, would pass beyond the reach of his creditors, there can be but little doubt, and I so find; there can be as little doubt, also, and I so find, that at the time the aforesaid agreement of January 1, 1908, was entered into, and the said stock was issued, Kraemer knew that the property to be acquired by the said company was fettered by claims far in excess of its value, and that the said note was in pledge to said City National Bank of Greenville.

When, therefore, we consider the above mentioned facts, together with the silence of Kraemer on the subject of the company's claim to have paid the note to Johnston with stock, as told by Mr. Haynsworth, and the further fact that with full knowledge of the condition of the property to be acquired by the said company, Kraemer goes ahead and issued said stock to Johnston, the conclusion is irresistible that he, in the first place, was shielding Johnston, and in the second place was assisting him to carry out his plans for defeating his creditors, and I so find as a matter of fact, and I further find as matter of law, that the plaintiff was and is chargeable therewith.

Both of the directors examined, testify that at the time they signed the paper, dated January 1, 1908, so often referred to above, they had no knowledge whatever of the fact that it was at that time hypothecated, nor of the attach-

ments that had at that time been levied on the said note and the land to be acquired, and it is contended that if the said stock was issued under the conditions which it is shown existed, that the said Johnston and Kraemer were guilty of a fraud upon the company, for which it should not be held responsible in its effects upon third parties. If the "company" did not know of the situation described at the time of the stock issue, it certainly knew of it when the Edwards, Thackston, Haynsworth attachment was levied, and if it considered that the issuance of the stock under the circumstances mentioned was a fraud upon it, it certainly was its duty to immediately take steps to repudiate the transaction and cancel the stock issue. This it has not done, but on the contrary, is now in this Court asking its aid to give effect to the said issue, and pronounce same a valid transaction. It cannot avail the plaintiff to say that the stock is now out of its possession, and beyond its recall. No account is given as to its whereabouts, but the stock is not negotiable, and a transfer thereof is not binding upon the company until such transfer is made on its books.

Again, when we recall the remark of Kraemer, who was cognizant of the whole situation, to the effect that he regarded the company protected no matter how the suit went—the silence of Johnston and the present attitude of the plaintiff—all appear to be suggestive of some secret understanding or arrangement between Johnston and the plaintiff, whereby the latter should indeed come unscathed out of the situation.

Also, for the reasons patent upon the face of this decree, the plaintiff cannot claim the protection of a purchaser for value without notice.

I find, therefore, as matters of fact:

(1) That plaintiff, prior to March 17, 1908, had notice, through its secretary and treasurer, of the fraud intended to be perpetrated upon its creditors by said R. E. Johnston.

(2) That the plaintiff, by the execution of the agreement evidenced by the paper dated January 1, 1908, in taking over, purchasing and receiving from the said Johnston all of his real estate in South Carolina, and in the same transaction paying its note to him as well as paying for the said lands, by the issuance of shares of its capital stock to said Johnston, knowingly assisted said Johnston in removing his property beyond the reach of his creditors. And I, therefore, find as matters of the law:

First. That the said acts of plaintiff and the said R. E. Johnston constituted a fraud upon the rights of the defendants, Edwards, Thackston and Haynsworth, creditors of said Johnston.

Second. That the plaintiff does not, therefore, come into this Court with clean hands, and cannot claim, and will not receive, its aid in the enforcement of its demands as against the said defendants, Edwards, Thackston and Haynsworth.

Third. That by reason of its said conduct the plaintiff cannot deny, as against the said defendants, Edwards, Thackston and Haynsworth, that the sum of money in dispute is the property of the said R. E. Johnston; nor can it now claim, as against said defendants, the said sum of money, nor be subrogated as against them, to any rights or equities of the said City National Bank of Greenville, in the said shares of stock in dispute and now held by said bank as trustee.

It is, therefore, ordered, adjudged and decreed, that the complaint be dismissed with costs.

The plaintiff appealed, and asked that the decree should be reversed, upon the grounds:

(1) Because it is based upon evidence that must clearly be excluded from consideration.

(2) Because the law of fraudulent conveyances is not applicable to the case of payment of a note: (a) since such transaction is not within the language nor the spirit of the

law; and (3) since even if it were, this agreement is severable, the consideration as to lands and the consideration of the satisfaction of the note being distinct.

(3) Because, in addition to the reasons just given, so far as the money is concerned, the plaintiff company has the legal right thereto, and it may enforce that right in a Court of law without resorting to a Court of equity; no equity of subrogation is sought, with respect to the money; therefore, the preliminary maxim in equity, referred to by his Honor, does not apply.

(4) Because there was no actual notice to plaintiff company of any intent to hinder or defraud his creditors on the part of Johnston and no actual fraud upon the part of the plaintiff company.

(5) Because his Honor is in error in basing his conclusion that the plaintiff company may not assert, as against the defendant, the original payment of its note, estoppel, when there is no estoppel in the case, as between these parties.

(6) Because, as to the stocks, plaintiff company has the equitable right of subrogation, an equity superior to any equity of the attaching creditors.

*Messrs. McCullough, Martin & Blythe,* for appellant, submit: *Incompetent evidence cannot be admitted because relevant:* 20 Cyc. 110; 2 Rich. L. 154; 23 How. (U. S.) 172, 187. *Treasurer a mere special and ministerial agent, whose authority must be shown:* 10 Cyc. 1060 and 936; 4 Thomp. Corp., sec. 4715; 27 Cyc. 793, 794. *His acts and knowledge will not be imputed to corporation:* 2 Pom. Eq. Juris., sec. 668; 12 N. D. 110; 95 N. W. 436; 31 Cyc. 1591, note 41; Cook, Corporations (6th ed.), secs. 717 and 726; note 2; A. C. (1902) 117; 8 W. & Ph. 7084. *But even if the secretary and treasurer had full power to act in regard to this particular matter, the conversations had with Mr. Haynsworth, when such officer was not actually engaged in the transaction, but in mere social intercourse, are not bind-*

*ing on the company and are not regarded as reaching him within the course of his agency, especially those conversations that took place long after the matter was consummated:* 2 How. (U. S.) 461; 31 Cyc. 1587, 1590; 69 S. W. 489; *Ib.* 437; 2 Lead. Cas. in Eq. 179; 74 S. C. 962; 170 U. S. 134; 66 Fed. 216; 13 C. C. A. 402. *In this connection we desire to point out to the Court that the mere assumption that Johnston and Kreamer did conspire to bring about this transfer will enable the Court to explain every single circumstance in the case in a manner "consistent with the complete innocence" of the Border State Lumber Company:* 20 Cyc. 751; 14 A. & E. Enc. of L. 486. *As to burden of proof:* 20 Cyc. 751; 14 A. & E. Enc. of L. 487, 489, 490; 20 Cyc. 756 and 759; 78 Tex. 597; 22 Am. St. Rep. 77; 109 N. C. 628; 14 S. E. 9. *Validity of deed from Johnston to plaintiff not involved in this action:* 14 A. & E. Enc. of L. 280, 281; 20 Cyc. 419; 76 S. C. 432. *And necessary parties to determination of that issue are wanting:* 56 S. C. 392, 393; 48 S. C. 165; 1 Rich. Eq. Cas. 185; 1 Hill Ch. 338; 1 Wall. 81. *In the first place, the Statute of Elizabeth has no application; because the paying of a debt is not within its terms:* Civil Code, sec. 3455; 20 Cyc. 406; 35 Vt. 16. *The transaction between Johnston and plaintiff was severable:* 7 A. & E. Enc. of L. 95, 97; 115 N. Y. 539; 12 Am. St. Rep. 832; 117 Wis. 91; 93 N. W. 807; 43 Ga. 305. *Plaintiff's legal rights should prevail. There was no actual notice to plaintiff of any intent upon Johnston's part to defraud his creditors, and no actual bad faith on the part of the plaintiff company:* 64 S. C. 364; 152 N. Y. 285; 46 N. E. 492; 57 Am. St. Rep. 515; 93 N. Y. 118; 11 L. R. A. 424. *There is no estoppel in this case:* 57 S. C. 507; 35 S. E. 800; 42 S. C. 348; 20 S. E. 157; 76 S. C. 573; 16 Cyc. 744. *Plaintiff's right to subrogation:* Bisp. Eq., sec. 27; 37 Cyc. 402, 406, 469, 470; 68 S. C. 439; 4 Cyc. 632, 633; 17 S. C. 123; 4 Cyc. 633; 99 Am. St. Rep. 488, 502 and 507; 2 Green's

Ch. (N. J. Eq.) 474; 29 Am. Dec. 723; 77 S. C. 311; 43 Pac. Rep. 669; Drake, Attachments 234.

*Messrs. Cothran, Dean & Cothran,* for respondents, submit: ( *1* ) *That the plaintiff has not established the agreement alleged in the complaint, i. e., that the plaintiff, on the 15th of December, 1907, concluded an agreement with Johnston to issue him 410 shares of stock in consideration that he cancel the $13,412.42 note and convey to them 3,800 acres of land; that even if this agreement be established it was clearly a scheme of collusion and fraud between them and Johnston to put his property beyond the reach of his creditors; that the manner of the execution of the alleged agreement by Johnston and Kreamer was a fraud upon the corporation which they could have successfully protested against; and the fact that they did not protest against the fraud committed upon them is proof conclusive that they are attempting to shield Johnston.* ( *2* ) *The plaintiff has not shown that it is a bona fide purchaser, not in collusion with Johnston.* ( *3* ) *The issue of the stock under the circumstances of this case, was a fraud upon the corporation and should not have been allowed.* ( *4* ) *The company at least had notice of facts sufficient to put it on inquiry:* 97 Ind. 285; 60 S. W. 397; 22 Ky. L. Rep. 1204; 74 N. W. 996; 7 N. D. 276; 66 Am. St. Rep. 642; 66 Pac. 284; 11 Okla. 16; 2 Pom. Eq. Juris. 210 and 225.

*Mr. C. F. Haynsworth,* also for respondents, submits: *Arnold's agency established:* 97 S. C. 150. *His statements, tending to show that the transaction was pretensive and fraudulent and thus impeaching the transaction and the title under which the company now claims, were admissible:* 5 Rich. Eq. 128; 4 S. C. 256; 4 Rich. 422; 9 Rich. 50. *It is the established rule that where fraud is charged great latitude will be allowed in the introduction of evidence:* 2 Rich. 154. *Burden of proof as to fraudulent intent:* 32 S. C. 171;

35 S. C. 431; 52 S. C. 345; 71 Mo. 353; Bump., Fraud. Conv., secs. 67 and 184; 72 Am. St. Rep. 838; 94 S. C. 68; 96 Pac. 978.   *Treasurer's knowledge imputable to plaintiff:* 216 U. S. 504; 83 Atl. 817; 82 S. C. 104.   *Purchaser of stock took subject to equities:* Hel. on Stock, secs. 111 and 121; Civil Code 2851.   *Not purchaser for value without notice:* 57 S. C. 21; 133 U. S. 43; 62 Pac. 652; 80 N. W. 963.   *Transaction void:* 4 S. C. 257; 82 S. C. 97; 20 Cyc. 444; 2 Bailey 324 and 329; 42 S. C. 475; 11 Rich. Eq. 114 and 122; Rich. Eq. Cas. 410; 3 Rich. Eq. 403; 20 Cyc. 354.

August 24, 1915.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

For the reasons assigned therein, the judgment of the Circuit Court is affirmed.

---

### 9295

#### TRIMBLE v. CARLISLE.

##### (88 S. E. 28.)

1. BILLS AND NOTES—TIMES OF PAYMENT.—Monthly payments on a note for $1,000, dated November 23, 1909, reciting: "Beginning July 23, 1910, * * * I promise to pay * * * $50 per month for twenty months.  Payments to be made on the 23d of each month after date of this note"—begin July 23, 1910.

2. EVIDENCE — COMMERCIAL REPORTS. — A report of Dun & Co. is a declaration, and incompetent to prove the value of a corporation's stock.

3. EVIDENCE—VALUE OF CORPORATE STOCK.—Testimony that at the time of trial, stock of a corporation was worthless, is not proof that it was worthless when defendant bought stock thereof, and gave his note therefor.

4. BILLS AND NOTES—ACTION — FRAUD OF PAYEE — EVIDENCE. — Neither what H., unknown to defendant when he bought stock of H. and in payment executed the notes sued on by their transferee, had told others about the stock, nor the price at which he had sold some of it to others, nor what statements H. made to W. when H. sent W. to